[No. 58402-8. En Banc. June 4, 1992.]

GORDON N. HIZEY, ET AL, *Appellants*, v. TIMOTHY W. CARPENTER, ET AL, *Respondents*.

252

*Robert B. Gould* and *Theodore D. Silva*, for appellants.

*Merrick, Hofstedt & Lindsey, P.S.*, by *Nancy K. McCoid*, for respondents.

DOLLIVER, J. — In an action for legal malpractice, plaintiffs attempted to apprise the jury of the former Code of Professional Responsibility (CPR) and the Rules of Professional Conduct (RPC) through expert testimony and jury instructions. The trial court excluded reference to the CPR and the RPC, through either an expert's mention of them or their use as jury instructions. The jury returned a verdict in favor of the defendants.

Plaintiffs appealed the trial court's ruling disallowing reference to the CPR and RPC, and the Court of Appeals certified the issue to this court for resolution. We accepted certification and transferred the case to this court for disposition. *See* RCW 2.06.030; RAP 4.3. We now affirm the trial court, holding an expert witness may neither explicitly refer to the CPR or RPC nor may their existence be revealed to the jury via instructions.

Gordon and Jessie Hizey, Baryldean Jo Carlson, Guy and Doris Fenimore, and Jeri Pickering sought legal advice from Timothy Carpenter regarding the sale of an 11.5-acre parcel of commercially zoned property in Mount Vernon, Washington. Plaintiffs had purchased the property in 1968 for

$80,000 and, prior to the transaction at issue, had sold two portions of the property to unrelated purchasers and were trying to sell the remainder.

In 1978, plaintiffs borrowed a $249,000 development loan from Mount Baker Bank and made interest-only payments on the loan. By 1983, plaintiffs were behind in interest payments and delinquent in tax payments. Additionally, there were liens against the property as a result of lawsuits against the Fenimores. Mount Baker Bank, which was considering foreclosure, would not make a new loan to plaintiffs alone.

In late 1982 or early 1983, plaintiffs were approached by the Four Star Group — of which James and May Finnegan were members — which wished to purchase the subject property for $950,000. Plaintiffs intended to give the purchasers a $270,000 "credit" against the price for paying off the underlying obligation to Mount Baker Bank. Plaintiffs signed a purchase and sale agreement with the buyers on June 18, 1983. Shortly thereafter, they met with Mount Baker Bank's Lynn Carpenter (wife of the defendant attorney herein), to discuss ways to restructure their loan based on the purchase and sale agreement. The bank would not agree to a straight sale without a substantial cash payment. In addition, the bank considered all members of the Four Star Group less than credit worthy except for the Finnegans, who planned to incorporate as Finnco. Given Mr. Finnegan's financial strength, the bank was willing to consider another loan provided all the original parties remained obligated under it. At this juncture, plaintiffs believed their negotiations with the buyers should be put in writing; they needed a document drafted to replace the original, unacceptable purchase and sale agreement, and they contacted Mr. Carpenter.

Plaintiffs brought the rejected purchase and sale agreement to their meeting with Mr. Carpenter, asking him to prepare a joint venture agreement (JVA) using the terms they gave him. They were anxious to have the documents prepared quickly so the loan would be extended and fore-

closure avoided. Mr. Carpenter felt the plaintiffs and Finnegans' group were in "total agreement" on what they wanted, as there was no negotiating or disagreement. He prepared a JVA which did not personally obligate the Finnegans, but obligated their corporation, Finnco; Mr. Carpenter testified he did not inform plaintiffs who was obligated.

As a result of the JVA, a $425,000 loan was approved, which was used to pay off the $249,000 existing loan, back taxes, and liens. Mr. Finnegan then worked on obtaining construction financing to build a hotel. As a prerequisite to obtaining construction financing, it was necessary to have title in the Finnegans' name. To achieve this, plaintiffs asked Mr. Carpenter to draft an agreement converting the JVA to a limited partnership. The limited partnership necessarily converted plaintiffs from creditors to investors or, as Mr. Carpenter admitted, from a debt to an equity situation.

In early 1986, although they had begun building the hotel, the Finnegans/Finnco were nearing bankruptcy. Around July 1986, Mr. Carpenter drafted a proposed furniture, fixtures, and equipment agreement (FF&E) in the hopes of saving the hotel project. The FF&E would have further subordinated plaintiffs' interest in the property, and Mr. Carpenter therefore advised them, for the first time, to seek independent counsel.

The Finnegans ultimately went bankrupt. Plaintiffs filed a claim, but the Finnegans' bankruptcy attorney took the position plaintiffs were owed nothing, since they were investors, not creditors. Plaintiffs eventually settled for $300,000, were awarded $150,000, and netted around $99,000.

Plaintiffs sued Mr. Carpenter in 1987, claiming they were unaware he "represented" both them and the Finnegans/ Finnco in drafting documents. At trial, defendants moved to exclude the testimony of Professor David Boerner — one of plaintiffs' expert witnesses — on grounds he was not an expert in real estate law, but would testify to the ethical obligations of an attorney. Such testimony was inadmissible, they argued, because the CPR and RPC do not create stan-

dards of civil liability. The trial court ruled Professor Boerner could not "ground" his testimony on the CPR and RPC, *i.e.*, he could not refer to specific rules or testify as to the existence of a codified body of ethics rules for attorneys. In addition, he could not testify the CPR or RPC set the standard of care in an action for legal malpractice. Professor Boerner was, however, allowed to testify that an attorney has ethical duties and to explain what those duties were in this case. As well as expounding on many other ethical aspects of the client-lawyer relationship, Professor Boerner defined a conflict of interest and explained an attorney's obligations when a conflict arises. He claimed there was a conflict of interest in this case and concluded Mr. Carpenter failed to fulfill his obligations in the conflict setting.

The jury returned a verdict in favor of defendant Carpenter, finding he had not been negligent. Plaintiffs moved for judgment notwithstanding the verdict (judgment n.o.v.) or, in the alternative, new trial. Both were denied. This appeal followed.

In addition to the issue certified to this court, plaintiffs claim the trial court erred in refusing to instruct the jury on the standard of care required of a "real estate specialist", and in prohibiting Professor Boerner from testifying about Mr. Carpenter's actions and alleged continued representation of the Finnegans after 1987, when this lawsuit was filed. Plaintiffs also challenge the trial court's instructions on damages and contributory negligence. Finally, plaintiffs contend the trial judge commented on the evidence, prejudicing their case, and erroneously failed to grant their motions for judgment n.o.v. and new trial. We address the issues seriatim.

*(1) In a legal malpractice action, may the jury be informed of the Code of Professional Responsibility or the Rules of Professional Conduct either directly through jury instructions or by the testimony of experts who refer to the CPR or RPC?*

During the period in which Mr. Carpenter was representing plaintiffs, his actions were governed by the CPR and the

RPC. The CPR applied until September 1, 1985, when it was superseded by the RPC. Plaintiffs contend the jury should have been informed of the existence of the CPR and RPC, as well as informed of the relevant provisions of each, either through the expert testimony of Professor David Boerner, or through jury instructions. Plaintiffs' argument, essentially, is that the CPR and RPC conclusively establish ethical standards of care for attorneys, and those ethical standards should also be relevant to the legal standard of care in a malpractice action. A violation of the CPR or RPC, they argue, is evidence of a breach of the attorney's duty and their expert should have been able to refer to specific provisions of the CPR and RPC in testifying as to the standard of care and its breach. Plaintiffs also argue the jury should have been instructed on the relevant portions of the CPR and RPC. The provisions of which plaintiff wanted the jury made aware were CPR DR 4-101(B) (preserving confidences and secrets of a client), CPR DR 5-105 (refusing to accept or continue employment if interests of another client may impair independent professional judgment of lawyer); CPR DR 7-101 (zealous representation); RPC 1.1 (competence); RPC 1.2 (scope of representation); RPC 1.4 (communication); RPC 1.6 (confidentiality); RPC 1.7 (conflicts of interest); and RPC 2.1 (advisor).

■ Neither the CPR nor the RPC purports to set the standard for civil liability. Quite to the contrary, the preliminary statement to the RPC states:

> The rules make no attempt to prescribe either disciplinary procedures or penalties for violation of a rule, nor do they undertake to define standards for civil liability of lawyers for professional conduct.

The CPR contained a similar disclaimer:

> The code makes no attempt to prescribe either disciplinary procedures or penalties for violation of a Disciplinary Rule, nor does it undertake to define standards for civil liability of lawyers for professional conduct.

Former CPR Preliminary Statement.

Based on such language, most courts that have addressed the issue hold violations of the CPR or RPC do not give rise to an independent cause of action against the attorney. *See* Ambrosio & McLaughlin, *The Use of Expert Witnesses in Establishing Liability in Legal Malpractice Cases*, 61 Temp. L.Q. 1351, 1360 n.46 (1988) (hereinafter Ambrosio & McLaughlin); *Peck v. Meda-Care Ambulance Corp.*, 156 Wis. 2d 662, 673, 457 N.W.2d 538 (Ct. App.) (finding no intent in code to create tort liability; opposite intent contained in disclaimer), *review denied*, 458 N.W.2d 533 (1990); *Brown v. Samalin & Bock, P.C.*, 155 A.D.2d 407, 408, 547 N.Y.S.2d 80 (1989) (holding even if attorney violated code, such violation did not "in itself, generate a separate cause of action").

The result of such holdings, with which we concur, has been that breach of an ethics rule provides only a public, *e.g.*, disciplinary, remedy and not a private remedy. 1 R. Mallen & J. Smith, *Legal Malpractice* § 6.27 (3d ed. 1989) (hereinafter 1 Mallen & Smith) (breach of a disciplinary rule provides only a public, and not a private, remedy); *State v. Lord*, 117 Wn.2d 829, 887, 822 P.2d 177 (1991) (remedy for claimed violation of RPC is request for discipline by the bar association); *Terry Cove North, Inc. v. Marr & Friedlander, P.C.*, 521 So. 2d 22 (Ala. 1988) (infractions of code provide basis for attorney discipline, not private cause of action); *Merritt-Chapman & Scott Corp. v. Elgin Coal, Inc.*, 358 F. Supp. 17 (E.D. Tenn. 1972) (no private action for breach of attorney's oath as officer of the court; remedy is public, not private), *aff'd*, 477 F.2d 598 (6th Cir. 1973). Because the CPR and RPC explicitly, and in what we deem to be clear and unambiguous language, disclaim any intent to create civil liability standards, we refuse to hold their violation creates a cause of action for malpractice.

Plaintiffs argue even if a violation of the CPR or RPC does not *create* a cause of action, such violation nonetheless provides evidence of malpractice. We are aware several commentators adhere to plaintiffs' view. *See, e.g.*, Ambrosio &

McLaughlin, at 1362 n.52; Wolfram, *The Code of Professional Responsibility as a Measure of Attorney Liability in Civil Litigation*, 30 S.C.L. Rev. 281, 286 (1979) (favoring expanded use of code despite disclaimer). In addition, we note several courts have adopted plaintiffs' position, but with little or no supporting rationale. Some courts simply assumed, with no analysis as to *why*, the CPR and RPC constitute evidence of the legal standard of care required of attorneys. *See, e.g.*, *Martinson Bros. v. Hjellum*, 359 N.W.2d 865, 875 (N.D. 1985); *Woodruff v. Tomlin*, 616 F.2d 924, 936 (6th Cir.), *cert. denied*, 449 U.S. 888 (1980). One court found it "anomalous" to hold professional standards of ethics not relevant in a tort action, *Rogers v. Robson, Masters, Ryan, Brumund & Belom*, 74 Ill. App. 3d 467, 473, 392 N.E.2d 1365 (1979), *aff'd*, 81 Ill. 2d 201, 407 N.E.2d 47 (1980), while another simply found it "unfair". *Lipton v. Boesky*, 110 Mich. App. 589, 597-98, 313 N.W.2d 163 (1981). Still others attempted some analysis of the issue, and ultimately equated the CPR and RPC with statutes — an analogy which we explore below. *See, e.g.*, *Fishman v. Brooks*, 396 Mass. 643, 649, 487 N.E.2d 1377 (1986); *Mayol v. Summers, Watson & Kimpel*, ___ Ill. App. 3d ___, 585 N.E.2d 1176 (1992).

■ We disagree with plaintiffs' — and the aforementioned courts' and commentators' — position that violation of the CPR or RPC may be used as evidence of malpractice. Again, we find the disclaimer language in both the CPR and RPC to be clear and unambiguous. In addition, there are significant policy reasons for barring the use of a violation of the CPR or RPC as evidence of attorney malpractice.

*The CPR and RPC are ill suited for use in the malpractice arena.*

■ To establish a claim for legal malpractice, a plaintiff must prove the following elements: (1) The existence of an attorney-client relationship which gives rise to a duty of care on the part of the attorney to the client; (2) an act or omission by the attorney in breach of the duty of care; (3) damage to the client; and (4) proximate causation between

the attorney's breach of the duty and the damage incurred. *See Hansen v. Wightman,* 14 Wn. App. 78, 88, 538 P.2d 1238 (1975); *Sherry v. Diercks,* 29 Wn. App. 433, 437, 628 P.2d 1336, *review denied,* 96 Wn.2d 1003 (1981); *see also Bowman v. John Doe,* 104 Wn.2d 181, 185, 704 P.2d 140 (1985) (once an attorney-client relationship is established, the elements for legal malpractice are the same as for negligence).

■ To comply with the duty of care, an attorney must exercise the degree of care, skill, diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer in the practice of law in this jurisdiction. *Hansen v. Wightman, supra* at 90 (citing *Cook, Flanagan & Berst v. Clausing,* 73 Wn.2d 393, 395, 438 P.2d 865 (1968)). In Washington, the standard of care for lawyers is a statewide rather than a local or community standard. *Hansen v. Wightman, supra* at 90.

Plaintiffs would have the factfinder in a legal malpractice action rely, at least in part, on an alleged ethical violation to find a breach of the legal standard of care. In furtherance of their argument, plaintiffs analogize the CPR and RPC to statutes or administrative regulations, the violation of which produces evidence of negligence or, in some jurisdictions, negligence per se. This analogy is flawed. The CPR and RPC are not statutes or administrative regulations. This court, not the Legislature, adopted the Code of Professional Responsibility and the Rules of Professional Conduct by court order, pursuant to its power to regulate the practice of law within the state. *See Short v. Demopolis,* 103 Wn.2d 52, 62, 691 P.2d 163 (1984) (Supreme Court has exclusive, inherent power to admit, enroll, discipline, and disbar attorneys); *Graham v. State Bar Ass'n,* 86 Wn.2d 624, 631, 548 P.2d 310 (1976) (power to regulate practice of law lies within sole jurisdiction of Supreme Court).

Furthermore, because they were never intended as a basis for civil liability, the CPR and RPC contain standards and phrases which, when relied upon to establish a breach of the legal standard of care, provide only vague guidelines. *See* Dahlquist, *The Code of Professional Responsibility and Civil*

*Damage Actions Against Attorneys*, 9 Ohio N.U.L. Rev. 1, 20 (1982) (arguing Code of Professional Responsibility is too vague to serve a practical purpose in malpractice litigation). Indeed, the Rules of Professional Conduct purport only to "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." RPC Preliminary Statement. Malpractice liability, on the other hand, is premised on the conduct of the "reasonable" lawyer. *Hansen*, 14 Wn. App. at 90. One court has succinctly stated the problem created when an alleged code violation is used as evidence of a breach of the standard of care:

> [I]n a civil action charging malpractice, the standard of care is the *particular duty* owed the client under the circumstances of the representation, which may or may not be the standard contemplated by the Code.

(Italics ours.) *Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.*, 813 S.W.2d 400, 405 (Tenn. 1991); *see also Carlson v. Morton*, 229 Mont. 234, 238, 745 P.2d 1133 (1987) (model rules are a "scheme" by which to judge attorney conduct in various, disparate matters, "often at times where one ethical rule seems to contradict another.").

We are not persuaded that either standard should be abandoned in favor of the other. On the contrary, both should continue to operate in their relative, *separate* spheres. As two noted commentators in the area of legal malpractice explain:

> There are several significant differences between a civil malpractice action and a disciplinary proceeding. First, a lawyer may be disciplined even if the misconduct does not cause any damage. The rationale is the need for protection of the public and the integrity of the profession. Second, although the severity of the breach may affect the nature of the discipline, the prophylactic purpose of the ethical rules may result in a sanction even if the conduct would not otherwise constitute a civil wrong. Third, even if the injured party initiates a disciplinary complaint, that individual is not a party to the proceeding. *These differences often mean that a rule promulgated for discipline is inappropriate as a principle of law or standard for defining proper civil conduct.*

(Footnotes omitted. Italics ours.) 1 Mallen & Smith § 1.9, at 33.

*Use of the CPR and RPC in the malpractice arena would contravene their purpose.*

As Mallen and Smith point out, ethics rules protect both the public *and* the integrity of the profession. They do so by establishing and regulating a balance among the court, attorneys, and clients. Faure & Strong, *The Model Rules of Professional Conduct: No Standard for Malpractice*, 47 Mont. L. Rev. 363, 365, 367-68 (1985-1986) (hereinafter Faure & Strong). Adoption of plaintiffs' position would upset that balance.

■ In evaluating the usefulness of the model rules as a standard of civil liability, two Montana commentators recognized their State Supreme Court adopted the rules to aid the legal system:

> The Model Rules exist to ensure the integrity of the legal system as a whole by forcefully reminding attorneys that their first loyalty is to the court. Taking the Model Rules out of this context removes the motivating force behind them. A legal malpractice suit neglects the party most involved in and affected by the professional standards of the Model Rules — the legal system itself. In a legal malpractice suit, however, the court reverts to its accustomed role as arbiter. The suit focuses on the relationship between the attorney *and* the client. Using the Model Rules in this context renders two harms. First, their use would emphasize only one aspect of the Model Rules — the attorney/client — to the exclusion of the Model Rules' impact on the legal system. Second, their use would encourage attorneys to elevate those Model Rules which relate to the attorney-client relationship. Attorneys would thereby distance themselves from the court system and consider more important their relationship with clients than their relationship with the legal system.

Faure & Strong, at 375. We concur with these observations.

■ Underlying our decision not to extend the CPR and RPC into the malpractice arena is the conviction that plaintiffs already have available adequate and recognized common law theories under which to bring malpractice actions. *See, e.g., Stangland v. Brock*, 109 Wn.2d 675, 747 P.2d 464 (1987) (negligence); *Halvorsen v. Ferguson*, 46 Wn. App. 708, 735 P.2d 675 (1986) (negligence), *review denied*, 108 Wn.2d 1008 (1987); *Peters v. Simmons*, 87 Wn.2d 400, 552 P.2d

1053 (1976) (breach of implied contract to exercise ordinary skill and knowledge in the rendition of professional legal services); *Busk v. Flanders*, 2 Wn. App. 526, 468 P.2d 695 (1970) (acknowledging existence of legal malpractice cause of action based on breach of express or written contract); *Easton v. Chaffee*, 8 Wn.2d 509, 113 P.2d 31 (1941) (malpractice action sounds in fraud where basis of action is false representation); 1 Mallen & Smith § 8. The CPR and RPC do not enlarge upon an attorney's common law duties. *Bush v. O'Connor*, 58 Wn. App. 138, 148, 791 P.2d 915, *review denied*, 115 Wn.2d 1020 (1990).

Courts of this state have historically not been hostile or unreceptive to the common law theories of malpractice, and, in fact, where the common law has been inadequate, we have allowed recovery under additional theories. *See Short v. Demopolis*, *supra* (applying Consumer Protection Act to entrepreneurial aspects of law practice). In this case, plaintiffs sued Mr. Carpenter under well-established theories of malpractice liability — negligence and violation of the Consumer Protection Act — and were never deprived of arguing either of those theories to the jury. The only "theory" they were not allowed to argue is that the CPR and RPC are equal to and coexistent with the legal standard of care. The trial court correctly excluded such testimony as a make-weight capable only of misdirecting the jury.

We realize courts have relied on the CPR and RPC for reasons other than to find malpractice liability and our holding today does not alter or affect such use. *See, e.g., Singleton v. Frost*, 108 Wn.2d 723, 742 P.2d 1224 (1987) (relying on disciplinary rule to determine reasonableness of attorney fees); *Eriks v. Denver*, 118 Wn.2d 451, 824 P.2d 1207 (1992) (holding violation of CPR is question of law, not fact); *Walsh v. Brousseau*, 62 Wn. App. 739, 815 P.2d 828 (1991) (holding contract for sale of law practice, which included duty on part of selling attorney to refer clients as consideration for the sale, violated RPC).

Moreover, even in malpractice cases, Washington courts have at times *assumed*, without squarely addressing, the

relevance of either an alleged or established violation of the CPR or RPC. *See, e.g., Hawkins v. King Cy.*, 24 Wn. App. 338, 602 P.2d 361 (1979) (holding duty under CPR to be loyal and to represent zealously client's interest overrides other ethics rules mandating disclosure of information which counsel considers detrimental to his client's stated interest). Nevertheless, the issue in this case has never been presented to the courts below or fully briefed in this court. Therefore, until now, we have never had cause to address it. As the foregoing cases were decided on different grounds, their holdings remain in force.

To avoid confusion in practice, we point out experts on an attorney's duty of care may still properly base their opinion, as Professor Boerner did in this case, on an attorney's failure to conform to an ethics rule. In so testifying, however, the expert must address the breach of the *legal* duty of care, and not simply the supposed breach of the ethics rules. *Carlson*, 229 Mont. at 240 ("[plaintiff] must prove not that various disciplinary rules were breached in his opinion; rather, he must demonstrate that [the attorney] failed in his legal duty."). Such testimony may not be presented in such a way that the jury could conclude it was the ethical violations that were actionable, rather than the breach of the legal duty of care. In practice, this can be achieved by allowing the expert to use language from the CPR or RPC, but prohibiting explicit reference to them. The expert must testify generally as to ethical requirements, concluding the attorney's violations of the ethical rules constituted a deviation from the legal standard of care. Without this evidentiary link, the plaintiff risks dismissal of the malpractice case for failure properly to establish the breach of the duty of care. Ambrosio & McLaughlin, at 1363.

Jury instructions, moreover, may not refer to the CPR or RPC. An expert's mention of them or their use as the basis of jury instructions could mislead the jury into believing the CPR and RPC conclusively establish the standard of care — precisely the result we wish to avoid. A balance must be maintained between legally enforceable standards

of care — *i.e.*, an existing common law sufficient to support civil grievances — and the professional autonomy and the enforcement of ethical standards by the professional rules. We believe an appropriate balance will continue to be maintained in this jurisdiction by the position we adopt in this case.

We therefore hold in a legal malpractice action that the jury may not be informed of the CPR or RPC, either directly through jury instructions or through the testimony of an expert who refers to the CPR or RPC.

*(2) Did the trial court err in refusing to instruct the jury on the standard of care required of a "real estate specialist"?*

Plaintiffs' proposed jury instruction 14, which the trial court declined to give, provided:

> A lawyer who holds himself out as a specialist in real estate related legal matters has a duty to exercise the degree of skill, care and learning reasonably expected of a reasonably prudent lawyer in the State of Washington acting in the same or similar circumstances at the time in question. Failure to exercise such skill, care and learning is negligence.

Clerk's Papers, at 165.

The trial court's instruction 11A addressed the standard of care as follows:

> A lawyer has a duty to exercise the degree of skill, care and learning expected of a reasonably prudent lawyer in the State of Washington acting in the same or similar circumstances at the time such services are provided. Failure to exercise such skill, care and learning is negligence.

Clerk's Papers, at 189.

Each party to a lawsuit is entitled to have its theories presented to the jury if such theories are supported by the evidence. *Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 616, 707 P.2d 685 (1985). Plaintiffs contend the refusal of the trial court to allow proposed jury instruction 14 deprived them of that right. They argue Mr. Carpenter's conduct should have been evaluated under a higher standard of care because he held himself out as a specialist in real estate law. Mr. Carpenter did testify most of the continuing legal

education seminars he attends involve real property law. In addition, although he does not consider himself a specialist, the emphasis of his law practice is on real estate law.

The courts of this state have frequently held the general "reasonably prudent lawyer" standard applies in legal malpractice cases. *See, e.g., Hansen v. Wightman,* 14 Wn. App. 78, 538 P.2d 1238 (1975). In a legal malpractice case involving the mishandling of a federal maritime personal injury action, we stated:

> Generally, one who holds himself out as specializing and as possessing greater than ordinary knowledge and skill in a particular field, will be held to the standard of performance of those who hold themselves out as specialists in that area.

*Walker v. Bangs,* 92 Wn.2d 854, 860, 601 P.2d 1279 (1979) (citing Restatement (Second) of Torts § 299A, comment *d* (1965)).

That language was not essential to the holding in *Walker*; the question we faced in that case was whether an expert witness not licensed to practice law in Washington, but knowledgeable about the handling of maritime claims in the federal courts, was qualified to testify on the standard of care. We held the expert's testimony admissible, but declined to address plaintiff's suggestion that there should be a national standard of practice for trial specialists. Therefore, the "specialist" language in *Walker* is dictum, and the trial court in this case was not bound to alter the standard of care instruction to reflect the nature of Mr. Carpenter's practice.

There is support for the notion that the standard of care should be different for those who hold themselves out as specialists in a particular area of law. *See, e.g.,* 1 Mallen & Smith § 15.4. In Washington, however, there is no "real estate specialist" standard of care. *See Hansen,* 14 Wn. App. at 90 (standard for Washington attorneys is statewide). Moreover, the CPR and the RPC prohibit a lawyer from holding himself out as a specialist in certain fields, with few exceptions not applicable in this case. RPC 7.4; former CPR

DR 2-105. The trial court informed the jury the applicable standard was that of an attorney in the same or similar circumstances. Plaintiffs were not precluded from arguing one of those circumstances was Mr. Carpenter's assertion that he handled real estate matters almost exclusively.

██ The trial court has considerable discretion in deciding how jury instructions will be worded. *Gammon,* 104 Wn.2d at 617. Based on the lack of authority in Washington for a "specialist" instruction in legal malpractice cases, it was not an abuse of discretion for the trial court to refuse plaintiffs' proposed jury instruction 14.

*(3) Where there was evidence the defendants continued to represent the Finnegans after plaintiffs filed this lawsuit, did the trial court err in excluding such evidence?*

Plaintiffs contend the trial court's exclusion of a portion of Professor Boerner's testimony was erroneous. Specifically, they argue Professor Boerner should have been allowed to testify Mr. Carpenter breached fiduciary duties owed the plaintiffs by continuing to represent the Finnegans even *after* this lawsuit arose. Plaintiffs conclude the court's ruling invaded the province of the factfinder because the jury should have been allowed to determine whether Mr. Carpenter's later actions were a proximate cause of plaintiffs' damages.

██ ██ The granting or denial of a motion to exclude certain evidence is addressed to the discretion of the trial court and should be reversed only in the event of abuse of discretion. *Fenimore v. Donald M. Drake Constr. Co.,* 87 Wn.2d 85, 91, 549 P.2d 483 (1976). A trial court abuses its discretion when the ruling is manifestly unreasonable or based on untenable grounds. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971). It is within the trial court's discretion to exclude evidence, the probative value of which is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. ER 403.

In their complaint filed in May 1987, plaintiffs stated Mr. Carpenter's acts during the period 1983 to 1985 fell below the standard of care and damaged plaintiffs. The claimed damage was the Finnegans'/Finnco's failure to pay for the land as required by the allegedly negligently drafted JVA. Professor Boerner would have testified, in the excluded portion, about breaches of fiduciary duty alleged to have occurred in 1988 and 1989, long after the complaint was filed, and plaintiffs had suffered their only claimed losses. Admitting such evidence could easily have misled or confused the jury. In addition, the evidence would merely have been cumulative: Plaintiffs themselves claim the evidence should have been admitted because it "bolstered other evidence regarding Carpenter's insensitivity to material issues of ethical rules governing his and his law firm's conduct." Brief of Appellant, at 49. We find the trial court's exclusion of the testimony was not manifestly unreasonable or based on untenable grounds.

*(4) Did the trial court err in its instructions regarding damages and contributory negligence?*

Plaintiffs assign error to jury instruction 24A, which provided:

> The value of a lost security interest is the value of the security interest, not the value of the property involved.

Clerk's Papers, at 203. Plaintiffs claim the instruction unduly emphasized defendants' damages theory. They argue the jury was entitled to find Mr. Carpenter was negligent from the *beginning* of his representation of plaintiffs, but instruction 24A led the jury to believe damages could only have flowed from the time of plaintiffs' lost security interest in the property.

In answer to the question on the special verdict form, "Was there negligence by the defendant Timothy Carpenter which was a proximate cause of injury or damage to the plaintiffs?", the jury answered "No". Clerk's Papers, at 211. It was instructed not to calculate plaintiffs' damages if it answered "no" to the question of negligence. The jury is

presumed to follow the court's instructions. *Bordynoski v. Bergner*, 97 Wn.2d 335, 342, 644 P.2d 1173 (1982). Therefore, the jury never even reached the issue of damages. Error relating solely to the issue of damages is harmless when a proper verdict reflects nonliability. *American Oil Co. v. Columbia Oil Co.*, 88 Wn.2d 835, 842, 567 P.2d 637 (1977). *See also Hansen*, 14 Wn. App. at 89-90 (holding jury verdict in favor of defendants, which established they were not negligent, rendered question of damages irrelevant). Inasmuch as the jury's conclusion that Mr. Carpenter was not *liable* would not have been different were instruction 24A not given, any error was harmless.

Plaintiffs also claim the trial court erred in instructing the jury on contributory negligence because the defense presented no evidence of contributory negligence. As with damages, the jury did not address the issue of contributory negligence. The jury was instructed, on the special verdict form, not to answer the question of whether plaintiffs were contributorially negligent if they found Mr. Carpenter was not negligent. Again, we presume the jury obeys the court's instructions. *Bordynoski*, 97 Wn.2d at 342. In a medical malpractice case, we declined to consider the sufficiency of evidence of contributory negligence because the jury had found the physician was not negligent and, therefore, "presumably never reached the issue of [the plaintiff's] contributory negligence." *Bertsch v. Brewer*, 97 Wn.2d 83, 92, 640 P.2d 711 (1982). Here, the jury did not reach the issue and therefore any error in giving the instruction was harmless.

*(5) Did the trial court comment on the evidence, prejudicing plaintiffs?*

Plaintiffs contend the trial judge erroneously commented on the evidence following plaintiffs' closing rebuttal and prior to discharging the jury to commence deliberations by saying, "proximate cause as Ms. McCoid [counsel for the defendant] said, is a difficult area of the law, it's an independent and intervening cause and there it is." Report of Proceedings, at 119-20 (Jan. 22, 1990).

■ Article 4, section 16 of the Washington Constitution prohibits judges from charging juries with respect to matters of fact, or commenting thereon, and mandates that they declare the law. The prohibition prevents the jury from being influenced by knowledge conveyed to it by the court of what the court's opinion is on the testimony submitted. A constitutionally prohibited comment on the evidence allows the jury to infer from what the judge said or did not say that he personally believed or disbelieved the testimony in question. *See State v. Hawkins*, 53 Wn. App. 598, 604, 769 P.2d 856, *review denied*, 113 Wn.2d 1004 (1989). The trial judge's statement was not a constitutionally prohibited comment on the evidence. He declared simply that proximate cause is "difficult", not "difficult to find in this case", or anything of that nature. Moreover, the "comment" was directed to counsel's *arguments*, which the jury was duly instructed are not evidence. Finally, in jury instruction 1, the court informed the jury:

> The law does not permit me to comment on the evidence in any way and I have not intentionally done so. If it appears to you that I have so commented, during either the trial or the giving of these instructions, you must disregard the comment.

Clerk's Papers, at 177.

■ Because we presume the jury obeys the instructions of the court, *Bordynoski*, 97 Wn.2d at 342, even if the court's comments were improper, the instruction to disregard comments on the evidence cured any error. *See Hawkins*, 53 Wn. App. at 604-05; *Dybdahl v. Genesco, Inc.*, 42 Wn. App. 486, 490, 713 P.2d 113 (1986).

*(6) Did the trial court err in denying plaintiffs' motion for judgment n.o.v. or for a new trial?*

■ We recently reiterated the standard of review for denial of such motions:

> In reviewing a trial court's decision to deny a motion for directed verdict or judgment n.o.v., we apply the same standard as the trial court. A directed verdict or judgment n.o.v. is appropriate if, when viewing the material evidence most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or

reasonable inferences to sustain a verdict for the nonmoving party. The requirement of substantial evidence necessitates that the evidence be such that it would convince "an unprejudiced, thinking mind".

The inquiry on appeal is limited to whether the evidence presented was sufficient to sustain the jury's verdict. Denial of a motion for directed verdict or judgment n.o.v. is inappropriate only when it is clear that the evidence and reasonable inferences are insufficient to support the jury's verdict.

(Footnotes and citations omitted.) *Industrial Indem. Co. of Northwest, Inc. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990) (quoting *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980)). The standard of review of denial of a motion for new trial is the same as that of a motion for judgment n.o.v. *See, e.g., Lewis v. Doll*, 53 Wn. App. 203, 765 P.2d 1341, *review denied*, 112 Wn.2d 1027 (1989); *Lockwood v. AC&S, Inc.*, 44 Wn. App. 330, 722 P.2d 826 (1986), *aff'd*, 109 Wn.2d 235, 744 P.2d 605 (1987).

The question, then, is whether there was sufficient evidence to support the jury's verdict. The jury found Mr. Carpenter was not negligent in his dealings with plaintiffs. Although some of the evidence was disputed, when viewed in the light most favorable to defendants, it is clear the jury rejected plaintiffs' testimony that they were unaware Mr. Carpenter was representing all parties, or that they would have proceeded with the transaction differently had they received independent advice, or that they were not under extreme financial pressure to sell the property. There was evidence, and the jury was entitled to infer, that the proximate cause of plaintiffs' damages was the Finnegan/Finnco bankruptcy, rather than Mr. Carpenter's action or inaction, and that the plaintiffs would have lost the property via foreclosure proceedings in 1983 had the Finnegans not become involved.

Giving the defendants the benefit of every favorable inference which reasonably may have been drawn from the *available* evidence, the denial of plaintiffs' motion for judgment n.o.v. or for a new trial was appropriate. *See Mason v. Turner*, 48 Wn.2d 145, 147-48, 291 P.2d 1023 (1956).

The defendant also raises several issues on cross appeal, but given our disposition of the case, we need not address them. We affirm the trial court in all respects.

DORE, C.J., and UTTER, BRACHTENBACH, ANDERSEN, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.

Reconsideration denied August 5, 1992.