[No. 55288-1-I.   Division One.   September 26, 2005.]

SHERRY W. STORMS, *Appellant*, v. FRED MEYER STORES, INC., ET AL., *Respondents*.

---

[18] *Id.* at 663-64.

*Lonnie G. Davis* (of *Washington Coalition of Citizens with disAbilities*), for appellant.

*West H. Campbell* (of *Hoffman, Hart & Wagner, L.L.P.*) (*Janet Schroer*, of counsel), for respondents.

*Julie L. Wilchins* on behalf of Washington Protection & Advocacy, amicus Curiae.

¶1 GROSSE, J. — A dog qualifies as a service animal within the meaning of the applicable state statute and administrative code provision if it is trained to assist or accommodate a person's sensory, mental, or physical disability. This court has interpreted this provision to require that there be some evidence of individual training that sets the animal apart from the ordinary pet, a requirement to which we adhere. And, because there was testimony at trial that Sherry Storms' dog was trained to put herself between Storms and other people so as to keep an open area around Storms and alleviate her anxiety (a symptom of her posttraumatic stress syndrome), we reverse the trial court. This was sufficient evidence to establish a prima facie case of discrimination against Fred Meyer Stores (Fred Meyer) for refusing to allow her to shop accompanied by her dog.

## FACTS

¶2 Sherry Storms suffers from multiple psychiatric conditions for which she receives treatment. Her conditions include posttraumatic stress disorder (PTSD) and recurrent depressions, and she has suffered from these conditions for approximately 30 years. One symptom of her PTSD is that she experiences a debilitating degree of anxiety that makes it difficult for her to go out in public.

¶3 In February 2001, acting on the recommendation of her doctor, Storms obtained a Rottweiler dog named Brandy. Storms intended to use Brandy as a service animal. Brandy underwent training in a 30-day, in-house boarding program at the Academy of Canine Behavior (Academy), a 4-week follow-up course at the Academy, and an intermediate follow-up course at PetSmart. At the Academy, Brandy underwent a temperament evaluation to make sure she was gentle and patient enough to be a service dog. Then Brandy went through basic obedience training which included elemental commands such as to sit, stay, lie down, come on command, and walk on a leash. Storms also gave the dog additional training.

¶4 At trial, Storms' ex-husband, Carl Garrison, testified that Brandy was "trained to put herself between Sherry and other people to keep, more or less, an open area around Sherry to control her anxiety"[1] and that "[t]he dog more or less leans on [Storms], and [Brandy] touches [Storms] in a certain manner that alleviates her anxiety."[2]

¶5 On or about August 10, 2001, Storms entered a Fred Meyer store for the purposes of obtaining some cheese that was on sale. She was accompanied by Garrison and her dog Brandy. Brandy was on a leash and collar, with no other identification. After entering the store, Storms went to the customer service desk to obtain a coupon for the sale cheese. A customer complained to Fred Meyer staff about the presence of the dog in the store. Robert Wedemeyer, the assistant food manager, responded to the complaint and approached Storms to inquire about the dog.

¶6 Storms asserted to Wedemeyer that Brandy was a service animal and showed him a laminated card as proof. Storms claims that Wedemeyer then insisted that she leave the store. Subsequently, Wedemeyer called the manager on duty, Kevin Elicker, who attempted to address the situation. During this time, Brandy was on a leash and was not threatening or barking. Garrison testified at trial that when Elicker arrived and it was getting crowded, "Brandy did what she's supposed to do, and she got up and more or less, walked around Sherry."[3] Elicker also noticed Brandy was "circling" Storms.[4]

¶7 The result of the discussion with Elicker was that Storms was not allowed to shop on her own or select her own purchase. Instead, a Fred Meyer employee was sent to get Storms' purchase and brought it to the service desk. Storms claims that the management did this in an effort to get her out of the store as quickly as possible.

---

[1] Report of Proceedings (RP) (Oct. 26, 2004) at 6.

[2] RP (Oct. 26, 2004) at 7.

[3] RP (Oct. 26, 2004) at 9.

[4] RP (Oct. 25, 2004) at 116.

¶8 On November 21, 2002, Storms filed a lawsuit complaining that Fred Meyer's refusal to allow her to remain in the store with Brandy constituted an unfair practice under RCW 49.60.215, an unfair practice in trade or commerce under RCW 19.86.020, and was a violation of 42 U.S.C. § 12182 and 45 C.F.R. § 36.303. At trial, she claimed to have suffered emotional distress, mental anguish, and aggravation of her underlying psychiatric conditions as a result of the incident.

¶9 At the close of Storms' case, the defendants moved to dismiss the case on grounds that Storms failed to fulfill her burden of proof to show that Brandy was a service animal within the meaning of RCW 49.60.040(23) and WAC 162-26-040 and that she failed to establish a prima facie case under RCW 49.60.215 for discrimination. The trial court granted the defendants' motion and concluded that:

3. Plaintiff's Rottweiler, Brandy, was not an animal trained to assist or accommodate plaintiff's mental disability within the meaning of RCW 49.60.040 and WAC 162-26-040.

4. Plaintiff was not subject to disparate treatment by the defendant, Fred Meyer Stores, Inc., and its employees due to her disability, and plaintiff was not treated differently than any other person entering the Fred Meyer premises with an animal, therefore defendants did not discriminate against the plaintiff based upon her mental disability or use of a medical service animal, in violation of RCW 49.60 et seq.[5]

Storms appeals.

## ANALYSIS

■ ¶10 RCW 49.60.215 prohibits discrimination against any person in a place of public accommodation based on the use of a service animal by a disabled person.[6] "Service

---

[5] Clerk's Papers (CP) at 15.

[6] RCW 49.60.215 states in pertinent part:

It shall be an unfair practice for any person . . . to commit an act which directly or indirectly results in any distinction, restriction, or discrimination . . . except for conditions and limitations established by law and applicable to all persons,

animal" is defined under RCW 49.60.040(23) as "an animal that is trained for the purpose of assisting or accommodating a disabled person's sensory, mental, or physical disability." Under WAC 162-26-040(2) a service animal is defined as "an animal that is trained for the purpose of assisting or accommodating a person's sensory, mental, or physical disability."

¶11 The main issue here is whether Brandy was an animal trained for the purpose of accommodating Storms' disability.[7] In *Timberlane Mobile Home Park v. Human Rights Commission*,[8] we recently addressed a similar issue in the context of housing. In *Timberlane*, Candida Campbell alleged that she was unfairly expelled from her trailer because of her disability and the use of a service animal. The administrative law judge (ALJ) found in Campbell's favor, but in doing so determined that (1) although her dog Spicey did not receive training to do so, she would "freak out" and get Campbell's brother when Campbell had a severe migraine incident and (2) while it is possible that Spicey would not have been trainable as a service animal, Spicey nevertheless assisted Campbell in alleviating her migraine condition by bringing her help when she was unable to help herself.[9] We reversed and determined that these factual findings were at odds with its legal conclusion that Spicey was a service dog.

¶12 Specifically, we noted that in order to be considered a service animal under the statute "there must be some evidence of individual training to set the service animal

regardless of . . . the use of a trained dog guide or service animal by a disabled person.

[7] We review a trial court's order granting a CR 50(a) motion by applying the same standard as the trial court, that is, such a motion should be granted only when it is clear that the evidence and the reasonable inferences, viewed in the light most favorable to the nonmoving party, are insufficient to sustain a verdict for the nonmoving party. *Hizey v. Carpenter*, 119 Wn.2d 251, 271-72, 830 P.2d 646 (1992).

[8] *Timberlane Mobile Home Park v. Human Rights Comm'n*, 122 Wn. App. 896, 95 P.3d 1288 (2004).

[9] *Timberlane*, 122 Wn. App. at 900-01.

apart from the ordinary pet."[10] Because the ALJ specifically found that Spicey had not been trained to assist Campbell and may not have even been trainable as a service animal, we found the ALJ's conclusion that Spicey was a service animal to be inconsistent and in error.

¶13 Our reasoning in *Timberlane* was based on the case *Prindable v. Association of Apartment Owners of 2987 Kalakaua.*[11] In *Prindable*, the plaintiff suffered from depression, anxiety, and dizziness and averred that his dog Einstein had been individually trained to provide him with emotional support and alert him to any unusual circumstances. The District Court of Hawaii concluded that the plaintiff's "[u]nsupported averments" and "slight anecdotal evidence of service" were not enough to survive a motion for summary judgment on the issue of whether his dog was a service animal, especially in light of the fact that plaintiff's counsel admitted to the court that Einstein had not been individually trained and possessed no special skills.[12] The *Prindable* court stated, "Plaintiffs needed something more—an affidavit detailing Einstein's training, a declaration from Einstein's veterinarian or a certificate from any licensed training school—to survive summary judgment."[13]

¶14 In the case at bar we have something more than the unsupported averments of individual training proffered by Prindable, but less than the level of evidence suggested by the *Prindable* court. Here, Brandy underwent training at the Academy of Canine Behavior and PetSmart.[14] When asked what kind of training Brandy received, Storms

---

[10] *Timberlane*, 122 Wn. App. at 900-01 (citing *Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1256 (D. Haw. 2003)).

[11] *Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245 (D. Haw. 2003).

[12] *Prindable*, 304 F. Supp. 2d at 1256-57.

[13] *Prindable*, 304 F. Supp. 2d at 1257.

[14] It is clear from the record that Storms' counsel offered as an exhibit a statement prepared at Storms' request from the Academy that Brandy had completed her one-month board and train program and beyond basics obedience class, but the parties have failed to designate the exhibit for our review. *See* RP (Oct. 26, 2004) at 26-27.

stated, "After they did her evaluation, temperament evaluation to make sure that she was gentle enough and patient enough to be a service dog, she went through basic training, just plain obedience basic training."[15] When asked what Brandy was taught in basic training Storms replied, "[s]imple commands most of which she already knew, set, stay, wait, down, off, leave it, come, how to walk on a leash without pulling."[16]

¶15 Her ex-husband, Carl Garrison, also was asked about Brandy's training and stated, "The dog is trained to put herself between Sherry and other people to keep, more or less, an open area around Sherry to control her anxiety" and that Brandy also leans on Storms and touches her in a certain manner that alleviates her anxiety.[17] And when asked about Brandy's behavior in the store, Garrison testified that "when the second manager came up and it was getting a bit crowded, Brandy did what she's supposed to do, and she got up and more or less, walked around Sherry."[18] Kevin Elicker, the store manager, also testified that he had observed Brandy "circling" Storms during their conversation at the customer service desk.[19]

¶16 Reading the facts in the light most favorable to Storms, Storms obtained Brandy at the recommendation of her doctor for the purposes of assisting her with her disability. She then sent Brandy to be trained at the Academy of Canine Behavior and PetSmart where Brandy was screened for her fitness to be used as a service dog, and then was given basic and intermediate obedience training. At some point, Brandy was trained to put herself in between Storms and others in order to keep an open area around Storms to help her control her anxiety. Brandy exhibited such behavior while in Fred Meyer.

---

[15] RP (Oct. 26, 2004) at 27.

[16] RP (Oct. 26, 2004) at 28.

[17] RP (Oct. 26, 2004) at 6-7.

[18] RP (Oct. 26, 2004) at 9.

[19] RP (Oct. 25, 2004) at 116.

¶17 This is evidence of individual training to set Brandy apart from the ordinary pet and we find that it is enough to survive a motion for a directed verdict. Garrison's testimony that Brandy had been specifically trained to help Storms with her particular disability by placing herself in between Storms and others in a way that alleviated her anxiety, when corroborated by Elicker's testimony that Brandy engaged in such behavior by circling Storms while in the store, meets the test as some evidence of individual training to set Brandy apart from the ordinary pet.

¶18 Having determined that there was sufficient evidence to establish that Brandy was a service dog, we also find that there was sufficient evidence to establish that the defendants' violated RCW 49.60.215 by not allowing Storms to do her own shopping within the store because she was accompanied by a service animal. The trial court specifically found that Storms "was not allowed to shop on her own or select her purchase."[20] This could certainly qualify as an act resulting in a "restriction" based on the use of a service animal by a disabled person prohibited under RCW 49.60.215.

¶19 For the above reasons, we reverse and remand for a trial.

Cox, C.J., and Schindler, J., concur.