[No. 49432-5-I. Division One. November 24, 2003.]

JEFFREY A. BARRETT, ET AL., *Appellants*, v. ERIC L. FREISE, ET AL., *Respondents*.

824

*Helga Kahr*, for appellants.

*Michael R. Caryl* (of *Mikkelborg, Broz, Wells & Fryer*) and *Teena M. Killian* and *Margaret A. Sundberg* (of *Williams, Kastner & Gibbs, P.L.L.C.*), for respondents.

KENNEDY, J. — After Jeffrey Barrett and his limited guardian, John Barrett, Jr., sued Eric Freise and his law firm for legal malpractice, breach of fiduciary duty, negligent misrepresentation, and violations of the Consumer Protection Act, chapter 19.86 RCW, as well as for disgorgement of legal fees paid and costs reimbursed from the settlement of Jeffrey Barrett's underinsured motorist claim, Freise countersued for recovery of unpaid legal fees and costs pursuant to the parties' contingency fee agreement that was executed at the outset of the representation. The trial court dismissed all of the Barretts' liability and disgorgement claims on summary judgment. Following a trial on Freise's counterclaim, the court awarded Freise and his law firm a money judgment against the proceeds of Jeffrey's recovery from American States Insurance Company, in the sum of $146,666.67 plus court costs and prejudgment interest. The Barretts appeal the dismissal of

their claims and the money judgment in favor of Freise. We affirm.[1]

## FACTS

### The Motor Vehicle Accident

On October 11, 1995, a serious motor vehicle accident left Jeffrey Barrett with devastating physical and mental injuries. Ned Maher, the at-fault driver, had been drinking before the accident. Jeff was airlifted to Harborview Medical Center, where he was treated for two weeks. He then was treated for two months at Providence Hospital in Everett.

Jeff's automobile insurance policy with Pemco provided policy limits of $100,000 in underinsured motorist (UIM) coverage for bodily injuries, $10,000 in Personal Injury Protection (PIP) medical benefits, and some wage loss coverage. The drunk driver had policy limits of $500,000 in liability coverage with American States Insurance Company. The Lucky 7 Saloon, where Maher had been drinking before the crash, carried a liability insurance policy with Crusader Insurance having policy limits of $1,000,000. Jeff also carried medical insurance with King County Blue Shield through his employment at The Boeing Company.

### JoLynn Barrett Retains Freise's Law Firm to Pursue Personal Injury Claims

Jeff's wife, JoLynn, contacted Eric Freise's law office on October 24, 1995. On November 30, 1995, she spoke with David Mulholland, then an associate in Freise's firm. Mulholland prepared a durable power of attorney and a fee agreement. On December 1, 1995, Freise and Mulholland met with JoLynn and Jeff at Providence Hospital. JoLynn, on behalf of her husband, her children, and herself, ex-

---

[1] Freise filed a "precautionary" cross-appeal challenging two interim rulings by the trial court, but requests that we address the cross-appeal only in the event of a reversal of the trial court's summary judgment dismissing the plaintiffs' liability claims, and the money judgment awarded to Freise. Because we affirm both of the trial court's judgments, we do not reach the cross-appeal.

ecuted the fee agreement retaining Freise to pursue the family's personal injury claims. The fee agreement allowed for an election between an hourly rate of $150 for attorney time or a one-third contingency fee. JoLynn elected the contingency fee by writing into a margin of the agreement: "I [prefer] the 331/3 contingency /s/ JoLynn Barrett 12-1-95." Clerk's Papers at 88. Freise and Mulholland left the unsigned durable power of attorney with JoLynn.

On December 27, 1995, Jeff was transferred to the Delta Rehabilitation Center. The head nurse there advised JoLynn to obtain a durable power of attorney so that she could arrange for Jeff's care. Jeff signed one that day, before a notary public who worked at the center.

Once the contingency fee agreement was signed, Freise's office began to obtain medical records, investigate the facts of the case, and notify insurers about the claims. On February 5, 1996, Freise, his legal assistant Cindy McWilliams, and Melonie Heaton, a registered nurse and case manager with expertise in head injury cases, visited the Delta Rehabilitation Center and met with Jeff and JoLynn. Because Heaton advised that Jeff was in need of more intensive therapy than was available at Delta, Freise contacted Jeff's medical insurer and persuaded the insurer to pay for Jeff's care at Mediplex—which was not one of the insurer's preferred providers.

On February 16, 1996, Jeff was transferred to Mediplex. Jeff's medical insurer eventually began to balk at paying Mediplex, however, so Jeff's treating physician, at Freise's request, wrote a letter to the insurer, stating that "[d]espite his improvement [Jeff] is still unsafe in the home without supervision" and requesting coverage for "an additional two weeks of treatment to see if we can transition him safely into his home." Clerk's Papers at 690.

On April 22, 1996, Freise obtained a policy limits offer of $100,000 from Pemco, the UIM carrier. Freise met with Jeff and JoLynn at the Mediplex facility and explained the offer, as well as the effect of signing a release for the UIM claim. Freise also explained that under the contingency fee agree-

ment, he would be retaining $33,333 and that he would also be reimbursing his law firm for costs advanced to the date of the settlement, leaving a net of some $64,000 to be paid to Jeff and JoLynn. With the approval of Jeff and JoLynn, the offer was accepted. After the release was signed and the settlement draft deposited, the UIM settlement proceeds were disbursed as above described, on May 8, 1996.

In the meantime, on May 1, 1996, Jeff returned home because the medical insurer refused to pay anything more for his care at Mediplex. Within days, it became apparent that Jeff required professional care and treatment that JoLynn, who was also responsible for the care of the parties' two young children, simply could not provide. Accordingly, Jeff moved to the home of his parents. He remained there until June 1, 1996, when JoLynn was able to arrange for him to enter New Beginnings, a group home for brain-injured men that was located near Jeff's parents' home. There, Jeff was to learn how to do various activities of daily living and to commence a vocational assessment program.

In late May 1996, Freise obtained an agreement from King County Blue Shield to waive its $155,452 medical subrogation lien. On June 14, 1996, in response to Freise's requests, American States allowed Freise to depose Maher. The deposition was helpful to Freise's investigation of the dram shop claim against the tavern and provided evidence to rebut a number of defenses that Freise had anticipated might arise.

On June 20, 1996, JoLynn told Freise's legal assistant that although she still loved Jeff, and wanted to be his friend and supporter, it was doubtful that she could stay married to him. She said that she anticipated filing for a divorce by the end of the summer.

### The American States' Offer

On June 24, 1996, as a result of Freise's efforts, the drunk driver's insurer, American States, offered its $500,000 policy limits in exchange for a release of the drunk driver. Freise and JoLynn met with the American States adjuster

and an American States structured settlement person. Freise did not counsel immediate acceptance of the offer because it was apparent that a $500,000 settlement would not be sufficient to provide for the needs of Jeff and the parties' minor children. Freise assessed the total value of the family's claims to be in the $3 million range. Based on his legal research, he was concerned that it would not be possible to preserve joint and several liability as against Maher and the tavern, if the family were to accept the policy limits offer before determining whether they could settle with or would be required to sue the tavern. Freise counseled JoLynn that it might be better to finish investigating the claim against the tavern, and then to make a serious effort to settle or mediate that claim, before consummating a settlement with the drunk driver. JoLynn agreed that this would be the more prudent course. American States committed to keep its policy limits settlement offer open while these matters were dealt with.

### JoLynn Files for Divorce

On August 30, 1996, JoLynn filed a petition for dissolution of the Barrett marriage, through her attorney, Rita Love. In mid-September 1996, Freise and Jeff's brother, John Barrett, Jr., had a lengthy telephone conversation about the personal injury case, during which John was informed of the UIM settlement, the $500,000 commitment from American States, and the one-third contingency agreement. Freise also explained the joint and several liability issue and why he felt that it was in everyone's best interest to defer consummating the settlement with American States. John told Freise that he planned to contact attorney Helga Kahr about representing Jeff in the marital dissolution case. Freise told John that, although Jeff and JoLynn would have different interests in how the personal injury recovery ultimately would be split up, he wished to continue working on the personal injury case, if that were to be agreeable with the lawyers in the dissolution action. Freise explained that he would seek to secure the most money

possible for Jeff and JoLynn, and that their respective marital dissolution attorneys could then tackle the question of ultimate division of the proceeds.

On September 16, 1996, Kahr notified Freise that she was representing Jeff in the dissolution action. On September 20, 1996, Freise received a fax indicating that Jeff had authorized Kahr and attorney Joseph Chalverus to look at Freise's files in the personal injury matter. On September 23, 1996, Kahr was told that she was free to come see the records whenever she wished.

On September 30, 1996, Freise wrote a joint letter to Kahr and Love, describing the Pemco settlement, the American States $500,000 offer, and the case against the tavern. He noted that they had held off on settling with American States and stated:

> Although $500,000 sounds like a lot of money, it does not go very far in a situation like this. All of us will have to work efficiently to maximize both private and public benefits for the best interests of Jeff, JoLynn and their two daughters. I look forward to working with each of you and hope that this can be resolved amicably. My files are open to both of you. If you wish to examine all or parts of them, please contact Cindy McWilliams and arrange a time.

Clerk's Papers at 1696. An assistant of Kahr reviewed the files at Freise's office on October 3, 1996.

On October 25, 1996, Freise again wrote Kahr and Love, stating:

> When I last wrote to each of you, I suggested a group meeting. Does anyone have any interest in this? Will it be possible for you to agree on how the $500,000.00 insurance limits from Mr. Maher should be divided and/or structured? Is there any chance of an agreement in the near future? Do we want to require Mr. Maher to pay something out of his own pocket in the years to come? <u>Do we want to settle now, or do we want to wait to see how the tavern claim does</u>? It would be helpful to us to know where you stand, so that we can proceed accordingly. Additional <u>legal research has [led] me to the conclusion that it</u>

may not be wise to settle with the driver until we at least attempt to resolve the liquor server claim.

Clerk's Papers at 1269. In the same letter, Freise advised Kahr and Love that an expert medical witness had reviewed information regarding the drunk driver and concluded that he had likely consumed three pitchers of beer before leaving the tavern and crashing into Jeff's vehicle.

On October 31, 1996, Kahr responded to Freise's letters and stated that she would like to think about the matters raised in his letters some more, but that her initial impression was that it would probably be worthwhile to go after the tavern and that it might not be wise to settle with Maher until the dram shop claim against the tavern was resolved.

Through the fall of 1996, Freise continued to work on the tavern case. On December 3, 1996, Kahr and Love met with Freise and discussed the case, his involvement, his fee contract, and potential conflicts arising from the marital dissolution action. Freise provided a copy of the fee agreement to Kahr and provided a nearly final draft of the settlement demand that he was working on to present to the tavern's insurer to both Kahr and Love. Kahr and Love agreed that Freise should continue to work on the personal injury claim, that he should make a settlement demand of the tavern, and that the family should not enter into a settlement agreement with American States because it would destroy joint and several liability.

Kahr and Love subsequently approved the demand letter so, on December 9, 1996, Freise submitted the settlement demand to the tavern's insurer.

The next day, Freise received a letter from Kahr that commented upon potential conflicts of interest and took a critical tone regarding the fee contract, the durable power of attorney in favor of JoLynn, the disbursal of UIM proceeds to JoLynn, and other matters, but authorized Freise to continue working on the personal injury case. Kahr did wish to change Freise's fee to an hourly basis

however, and she stated that she thought that Tracy Waggoner, the guardian ad litem proposed by the dissolution attorneys to represent Jeff's interests in the dissolution action, would agree. She concluded the letter by stating that nothing in her letter was meant to imply that Freise's representation of Jeff had been below the standard of care.

On December 10, 1996, and again on January 13, 1997, Freise wrote Waggoner, who by then had been appointed as Jeff's guardian ad litem in the marital dissolution action, and explained the personal injury case in detail, including the contingency fee agreement. Waggoner responded that Freise should continue his role in the personal injury case.

In a January 17, 1997 letter, Kahr asked Freise not to call Jeff anymore and to send all mail communications to Jeff through her.

On February 3, 1997, Waggoner wrote Kahr and Love and sought their input, noting that the attorney fee issue would need to be resolved, given its potential impact on the available monies to be divided.

On February 11, 1997, and March 11, 1997, Freise wrote the Barretts, their attorneys, and Waggoner about his communications with the tavern's insurance adjuster, and the status of his investigation. He indicated his hope that, even if there were to be a denial of liability, there could be mediation before filing suit.

On March 13, 1997, Freise received a letter, signed by Jeff and his brother John, discharging him as Jeff's attorney in the personal injury matter and requesting a fee and cost statement. On March 17, 1997, Kahr wrote Waggoner, stating that Freise had been discharged and that she was serving as Jeff's general counsel for the interim while he settled on new counsel who would handle the personal injury matter on a fee basis more advantageous to Jeff.

The efforts to discharge Freise were done without the agreement of the guardian ad litem, JoLynn, or her attorney Rita Love. On March 19, 1997, JoLynn filed a motion and declaration in the dissolution action, noting her oppo-

sition to Freise's discharge without involvement of the guardian ad litem and asking the court to clarify and/or expand the guardian's role to include decisions in the personal injury case.

On March 25, 1997, Freise wrote Waggoner and provided a summary of his time and costs through March 25, 1997. Copies were sent to Jeff, John, Kahr, and Love.

On March 31, 1997, John and Jeff filed an ex parte proceeding seeking to have John appointed as Jeff's limited guardian. The next day, John and Jeff, noting the pendency of the limited guardianship action, filed a document in the marital dissolution action opposing JoLynn's motion to clarify the role of the guardian ad litem and seeking to have Waggoner discharged in favor of John as Jeff's guardian.

On April 22, 1997, John was appointed as Jeff's limited guardian to handle all matters concerning Jeff's estate, including legal, financial, and contractual matters. On April 24, 1997, John, in his capacity as limited guardian, discharged Freise as Jeff's personal injury attorney. Freise then advised JoLynn to find replacement counsel for herself and the children, and she did so. John also replaced Tracy Waggoner as Jeff's guardian in the dissolution action.

At some point prior to his discharge, Freise ascertained that the drunk driver was essentially judgment-proof, and that he had been drinking quietly in the tavern and not drawing attention to himself prior to the accident.

In a May 5, 1997, letter to Freise, Kahr criticized Freise for having disbursed the balance of the UIM settlement proceeds to JoLynn and asserted that Freise knew that JoLynn was contemplating divorce at the time of that disbursement. Despite her previous agreement that in order to preserve joint and several liability, it was not in the family's best interests to consummate the settlement with American States while the tavern matter was unresolved, Kahr criticized Freise for *not* having consummated the American States settlement. She pointed out that Jeff had lost interest income as a result. She also criticized Freise for

communicating with Waggoner about his legal fees, even though she had previously indicated that Waggoner should be involved, and she challenged the costs that Freise had advanced for experts in the personal injury action, claiming that Jeff had not authorized incurring any expert witness fees. She also asserted that Freise owed Jeff $5,366.86 and that, if Freise did not pay this sum by May 7, 1997, Jeff and John Barrett would sue him. Freise declined to meet Kahr's demands, but advised of his willingness to extend the statute of limitations provided by RCW 4.24.005, to allow for mediation or a settlement conference regarding the fee issues.

### The Fee Reasonableness Petition and Amended Petition

On May 9, 1997, John and Jeff Barrett filed a petition in King County Superior Court for a determination of the reasonableness of Freise's contingency fee agreement, pursuant to RCW 4.24.005. Shortly thereafter, venue was transferred from King County to Snohomish County, at Freise's request. In July 1997, John and Jeff amended their petition to add claims of legal malpractice, breach of fiduciary obligations, negligent misrepresentation, and a Consumer Protection Act claim with respect to Freise's handling of the personal injury matter. They also sought disgorgement of the contingency fee and reimbursement for costs advanced that Freise had retained from the UIM settlement proceeds. Freise denied liability and counterclaimed for additional fees earned and costs advanced for Jeff in the personal injury action, to the date of his discharge.

### The Summary Judgment Motions

In May 1998, Freise filed a motion for summary judgment, seeking dismissal of John and Jeff Barrett's liability and disgorgement claims. The parties filed opposing summary judgment motions on the attorney fee and costs issues.

On June 27, 1998, the trial court entered an order on summary judgment dismissing all of John and Jeff's liability claims against Freise and his law firm, with prejudice.

On July 24, 1998, the court denied John and Jeff's motion for summary judgment in which they had sought a determination that Freise was entitled to no fee whatsoever for the law firm's work obtaining the $100,000 UIM recovery and the $500,000 policy limits commitment from American States. The court also denied the plaintiffs' motion for summary judgment that the law firm was not entitled to reimbursement for its costs advanced in connection with either recovery. And the court denied the plaintiffs' alternative motion for summary judgment that the law firm be limited to fees based on an hourly rate, rather than the contingency fee agreement. The court ruled that Freise was entitled to keep the $33,333 contingency fee that had already been paid from the $100,000 UIM recovery from Pemco. The court also ruled that the law firm was entitled to retain the $2,768.38 for hard costs that had already been paid from that recovery.

In the same order, the court granted Freise's motion for summary judgment that the law firm was entitled to recover an additional $7,428.86 for hard costs advanced for Jeff in connection with the American States and tavern claims.

With respect to Freise's request for summary judgment for one-third of the $500,000 American States settlement commitment amount, the court concluded as a matter of law that the law firm had a binding contingency fee agreement based on JoLynn's authority as a manager of the marital community to bind the family to the terms of that agreement. The court also concluded that the law firm had fully performed the contingency fee agreement with respect to the policy limits offer from American States. But the court deferred the determination of the amount to be paid from the American States settlement until there was a final resolution of the dram shop action.

And in the same order, the court found 16 facts to have been established as a matter of law because the plaintiffs had failed to present evidence that would have raised a genuine issue of material fact as to any of them.

In the fall of 1998, the Barretts filed two separate lawsuits, one against the drunk driver, Maher, in Snohomish County, and the other against the Lucky 7 Saloon, in King County. Jeff and John were represented by attorneys Kahr and Chalverus in these actions. JoLynn and the children had separate representation. The tavern ultimately offered $400,000 to settle the dram shop claim. John and Jeff rejected the offer, but JoLynn and the children accepted $50,000 to settle their dram shop claims. Jeff's dram shop claim then proceeded to a jury trial in King County, which resulted in a defense verdict.

John and Jeff appealed the judgment on the verdict to this court, which affirmed in an unpublished opinion noted at 112 Wn. App. 1041 (2002). The Supreme Court granted review, 148 Wn.2d 1015 (2003). The case was argued on May 15, 2003. At this writing, the Supreme Court's opinion has not yet been filed.

Following the defense verdict in the dram shop trial, JoLynn and the minor children settled their claims against the drunk driver for $60,000. Jeff and John settled Jeff's claim for the remaining $440,000 of the American States policy limits. The settlement proceeds were paid into the court registry in Snohomish County on December 1, 2000.

The court approved the settlement on behalf of the minor children and approved the stipulation whereby $20,000 in legal fees from the $60,000 settlement was to be divided between the Freise law firm and the attorney who had completed JoLynn's representation after Freise's withdrawal. The sum of $146,666.67 was retained in the clerk's trust account pending trial of the reasonableness petition. After the court approved the limited guardian's settlement of Jeff's claim against the drunk driver, the balance of the American States proceeds, $440,000, was paid to John Barrett for the benefit of Jeffrey Barrett. The proceeds were

disbursed when the settlement draft was cleared for payment, on or about January 10, 2001.

Meanwhile, the marital dissolution action was tried in Snohomish County Superior Court in 1998, before the same trial judge who heard the summary judgment motions in the legal malpractice case. The dissolution court rejected Jeff's claims that JoLynn had wasted the settlement proceeds from the UIM settlement and found that, with a minor exception which was taken care of in the overall property distribution, JoLynn had spent the $64,000 in net UIM settlement proceeds for Jeff's care and that of the parties' minor children.

### The Trial

In June 2001, the remaining issues regarding Freise's attorney fees for the personal injury action were tried to the same judge who had presided over the marital dissolution trial and the earlier summary judgment proceedings. The trial lasted five days, during which the court limited the parties to presenting evidence in support of John and Jeff's claim that Freise was owed nothing for his services regarding the settlement with American States and Freise's counterclaim that he was entitled to receive one-third of Jeff's net recovery of $440,000 from the American States recovery. On September 27, 2001, the court entered lengthy and detailed findings of fact and conclusions of law, incorporating the 16 findings found to be uncontroverted at the time of the summary judgment, and also incorporating its earlier finding from the dissolution trial that JoLynn had not wasted the net proceeds from the UIM settlement. Based on its findings and conclusions, the trial court entered a judgment in favor of Freise and his law firm in the amount of $147,281.28 inclusive of costs and prejudgment interest from January 10, 2001.

John and Jeff then filed this appeal, raising 66 assignments of error and 32 issues challenging the trial court's summary judgment rulings and numerous of its findings of fact and conclusions of law following the trial.

## ANALYSIS

### Jeff's Liability Claims

The first contention on appeal is that the trial court erred in granting summary judgment dismissing the legal malpractice, breach of fiduciary obligation, negligent misrepresentation, and Consumer Protection Act claims.

■ We observe at the outset that the Barretts fail to address and argue their negligent misrepresentation and Consumer Protection Act claims in their briefing for this appeal. Accordingly, we summarily affirm the dismissal of those claims, without discussion.

■■ An appellate court reviews a summary judgment order de novo, performing the same inquiry as the trial court. *Kruse v. Hemp*, 121 Wn.2d 715, 853 P.2d 1373 (1993). Summary judgment is proper if, after considering all of the facts and all reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000). Ultimate facts, conclusions of fact, conclusory statements of fact or legal conclusions are insufficient to raise a question of fact. *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988).

■ To establish a legal malpractice claim, a plaintiff must establish the existence of an attorney-client relationship, the existence of a duty on the part of the lawyer, failure of the lawyer to perform the duty, and that the lawyer's negligence in failing to perform proximately caused damage to the client. *Halvorsen v. Ferguson*, 46 Wn. App. 708, 711, 735 P.2d 675 (1986).

There is no evidence in the record that Freise was negligent in advising deferred consummation of the American States settlement commitment pending resolution of the tavern claim. Freise was attempting to obtain a larger amount for the Barretts by holding the prospect of joint and

several liability over the tavern's head, and the Barretts do not contend, nor can they, that Freise's joint and several liability advice concerning the American States offer was legally incorrect. *See Kottler v. State*, 136 Wn.2d 437, 447, 963 P.2d 834 (1998) (settling, released, and immune parties are not parties "against whom judgment is entered" and will not be jointly and severally liable under RCW 4.22.070(1)(b)). Moreover, more than a year after Jeff's injury, Kahr, in her role as Jeff's dissolution attorney, told Freise that she agreed that acceptance of the American States settlement commitment should be deferred. And, after she took over Jeff's representation in the personal injury matter, she, too, deferred consummating the settlement, for the same reason.

■ Nevertheless, John and Jeff argue on appeal that deferring acceptance of American States' commitment to pay policy limits caused Jeff to lose interest income on those settlement proceeds. While this is true, it does not follow that Freise breached any duty to Jeff in counseling the deferral. As the trial court observed at the time of the summary judgment, more than a year had elapsed since Kahr took over Jeff's representation, and Kahr had done nothing of substance to prosecute the tavern claim. When Kahr eventually filed suit against the tavern, she filed it in King County, separately from the corresponding suit against the drunk driver, which she filed in Snohomish County—thereby assuring, according to the trial court's unchallenged conclusion of law, that joint and several liability would be lost. And then Kahr waited until November of 2000 to consummate the settlement with American States. The court clearly did not err, at the time of summary judgment, when it concluded that no genuine issue of material fact prevented entry of judgment as a matter of law that Freise breached no duty owed to Jeff Barrett with regard to his advice to defer accepting the settlement commitment by American States, and that Jeff was not injured by any negligence, on Freise's part, with respect to that advice.

The trial court also concluded, at the time of summary judgment, that Freise did not violate any duty owed to Jeff Barrett by consummating the $100,000 settlement of the UIM claim and by paying the net proceeds of that settlement over to JoLynn Barrett. There was no evidence whatsoever that JoLynn was contemplating divorce at the time of that settlement or that, if she were, she had communicated her concerns about the viability of the marriage to Freise or his staff. The undisputed evidence was that JoLynn first told Freise's legal assistant on June 20, 1996, that she anticipated filing for divorce at the end of summer. By then, the settlement with the UIM carrier had long since been consummated and the net proceeds paid to JoLynn. No evidence was presented to the court during the summary judgment proceedings that JoLynn had wasted the settlement proceeds. Moreover, as the trial court subsequently observed, following trial, in the time intervening between the summary judgment and trial, the court had presided over the dissolution trial and found that JoLynn had not wasted the UIM settlement proceeds, in any event. And finally, the evidence at the time of summary judgment showed that Freise worked closely with the attorneys who were handling the marital dissolution action and the court-appointed guardian ad litem and obtained the approval of *all* of them to continue representing the Barrett family in the personal injury action, leaving it up to the dissolution lawyers to either settle or try the ultimate distribution of the personal injury proceeds.

Accordingly, we hold that the trial court did not err by dismissing Jeff Barrett's legal malpractice claims by way of summary judgment.

Neither did the court err by dismissing the breach of fiduciary obligation claims. These claims were based on the contention that Freise had a conflict of interest and could no longer represent Jeff and JoLynn in the personal injury action once he learned that JoLynn was contemplating divorce. As we have already discussed, the UIM settlement proceeds had already been distributed by that time,

and once JoLynn actually filed for divorce, Freise worked closely with the attorneys and guardian ad litem in that action, keeping them fully advised and receiving their input regarding decisions to be made in the personal injury action. Each of them *expressly* approved both Freise's continued representation of the Barretts in the personal injury action and his proposed course of conducting the case. No evidence whatsoever supported the speculation on the part of John Barrett and Helga Kahr that Freise and JoLynn had somehow colluded with respect to deferring consummation of American States' commitment to settle the claims against its insured in exchange for a payment of policy limits. Not only did the dissolution attorneys and guardian ad litem expressly approve of that strategy, but also, by the time of the summary judgment ruling, the plaintiffs had admitted that it was JoLynn, not Freise, who made the ultimate decision to defer accepting the offer from American States.

Although the plaintiffs presented a declaration from attorney Robert Gould, at the time of summary judgment, in which he opined that Freise did have a conflict of interest in continuing to represent Jeff and JoLynn in the personal injury action, thereby violating Freise's obligations under the Rules of Professional Conduct, and thereby violating the standard of care required of attorneys as well, we agree with the trial court that Gould's declaration raised no genuine issue of material fact. First, whether an attorney's conduct violates the Rules of Professional Conduct is a question of law, not a question of fact. *See Eriks v. Denver*, 118 Wn.2d 451, 457-58, 824 P.2d 1207 (1992). Moreover, in *Hizey v. Carpenter*, 119 Wn.2d 251, 259-60, 830 P.2d 646 (1992), the Supreme Court held that violations of ethical rules do not give rise to an independent cause of action against an attorney or provide evidence of malpractice. Thus, any ethics rule violations by Freise, if John and Jeff were able to prove them, which they are not, would not, by themselves, be actionable. *Hizey*, 119 Wn.2d at 265. Rather, in a malpractice action, the standard of care is the particu-

lar duty owed the client under the circumstances of the representation, which may or may not be the same standard contemplated by the ethics rules. Thus, an expert such as Gould must address the breach of the legal duty of care, not simply a supposed breach of the ethics rules. *Id.* at 262, 265.

More importantly, there simply was no conflict of interest raised by Freise continuing to represent the interests of both JoLynn and Jeff as to the personal injury claim while their dissolution action was pending. They both had the *same* interests with respect to the personal injury claim—to recover as much as reasonably possible and then let their dissolution attorneys address their respective interests in the ultimate characterization and division of the proceeds recovered. Kahr expressly agreed to Freise's continued representation; Love expressly agreed to Freise's continued representation; Waggoner expressly agreed to Freise's continued representation. Freise kept these three lawyers constantly advised of the progress of the representation and invited their participation in the issues that needed to be addressed—and got their express approval of the course of conducting the claims. John and Jeff's contention that there was a conflict of interest is a bald assertion, unsupported by any evidence or meritorious legal analysis whatsoever. The trial court did not err in dismissing the claims of breach of fiduciary obligation.

Finally, the Barretts contend that Jeff was not competent to execute the durable power of attorney in favor of JoLynn while he was at Delta Rehabilitation Center. Although the argument is unclear, the contention appears to be that Freise violated his fiduciary duties to Jeff in connection with the durable power. The undisputed evidence, however, is that although a durable power was prepared in Freise's office and left unsigned with JoLynn on December 1, 1995, while Jeff was still at Providence Hospital, neither Freise nor anyone in his office ever asked Jeff to sign it. After Jeff was transferred to Delta Rehabilitation Center, the head nurse there advised JoLynn to obtain a durable power of

attorney so that she could arrange for Jeff's care at the center. No one from Freise's office was present when a durable power of attorney—whether the one prepared in Freise's office or another one is immaterial—was executed by Jeff at the center, on December 27, 1995. Jeff signed the document before a notary public who worked at the center.

In any event, it is clear that the trial court did not rely upon the durable power in considering the validity of the contingency fee agreement, the settlement with the UIM carrier, or the decision to defer acceptance of the commitment by American States to pay its policy limits in exchange for a full release of its insured. To the extent that JoLynn may have utilized the power to arrange for Jeff's medical care, the plaintiffs do not argue that Jeff was somehow harmed thereby. Thus the circumstances under which the durable power of attorney was prepared and signed raises no genuine issues of material fact germane to these proceedings.

Moreover, as the trial court aptly observed, Kahr had Jeff sign a power of attorney in favor of his brother John shortly after she appeared for Jeff in the marital dissolution action.

In sum, we affirm the trial court's summary judgment order dismissing all of the plaintiffs' liability claims, including their negligent misrepresentation and Consumer Protection Act claims.

### Summary Judgment in Favor of Freise Regarding Contingency Fees

John and Jeff Barrett's next contention on appeal concerns the trial court's rulings on summary judgment dismissing their claim that Freise was entitled to no fee whatsoever for his services to Jeff in obtaining the $100,000 UIM settlement and the $500,000 American States commitment to settle for policy limits. In a counter summary judgment motion, John and Jeff asked that Freise be required to disgorge, as a result of alleged ethical violations, the $33,333.33 in fees he had received from the UIM settlement, or, alternatively, that the court apply the terms

of the fee contract that allowed for an election of an hourly fee.

The primary ethical violation alleged was the consummation of the UIM settlement at a time when Freise allegedly knew that JoLynn was contemplating divorce. But the record fully supports the trial court's determination that Freise had no notice whatsoever that JoLynn was contemplating divorce until she told his legal assistant so, on June 20, 1996. John and Jeff provided absolutely no evidence to the contrary. The UIM settlement was consummated and the net proceeds were disbursed in early May of 1996. Accordingly, there was no genuine issue of material fact in this regard.

John and Jeff also claim that Jeff was not bound by JoLynn's election to enter into a contingency fee arrangement, and that once John was appointed as Jeff's limited guardian, John had the election to choose the hourly fee arrangement instead. The clause in the contract that gives rise to this argument provides that the client "may elect at the conclusion of this contract" to pay for the attorneys' legal services at the "rate of $150.00 per hour for attorney time and $75.00 per hour for paralegal time or a contingent fee based on the gross amount of recovery obtained for the Client" of 33 1/3 percent of the gross amounts recovered by way of settlement, arbitration, or trial. Clerk's Papers at 88.

But JoLynn did not wait until the end of the contract to make the election. She elected the contingency fee arrangement, in writing, at the outset of the agreement. The contract does *not* provide that the client can make one election at the outset and change her mind later, or that one member of a family of clients can make one election at the outset of the contract and that another member of the family can make a different election at the end of the contract.

Relying upon *Foster v. Williams*, 4 Wn. App. 659, 662, 484 P.2d 438 (1971), the trial court concluded that JoLynn had the inherent authority as statutory agent for the marital community to act for her incapacitated hus-

band, herself, and the marital community in matters related to the injuries giving rise to the husband's incapacity. John and Jeff do not even cite *Foster v. Williams* in their brief for this appeal, let alone argue that it is inapplicable to the facts in this case. Neither do they cite any contrary authority that could arguably govern the issue. Accordingly, the trial court's legal conclusion that JoLynn had the authority to bind both herself and Jeff to the terms of the contingency fee contract is unchallenged on appeal and constitutes the law of this case. We affirm the trial court's ruling that Freise was entitled to retain the contingency fee paid for the UIM settlement proceeds in accord with the parties' contingency fee agreement.

 The court also rejected John and Jeff's claim on summary judgment that Freise should recover no fee whatsoever for his services in obtaining the commitment from American States to pay its policy limits. As the trial court recognized, a client may not deprive a lawyer of his contingency fee by discharging him just short of completion of the contract, where the lawyer has substantially performed under the contract. *Taylor v. Shigaki*, 84 Wn. App. 723, 728-29, 930 P.2d 340 (1997). A discharged lawyer has substantially performed his or her duties when the attorney's efforts make a settlement "practically certain," even if the settlement is consummated after the client fires the attorney. *Id.* at 729. To permit a client to terminate a lawyer after substantial performance but before a settlement offer is accepted and money received would eviscerate the usefulness of contingency fee contracts. *Id.* The record unequivocally establishes that Freise had substantially performed under the agreement regarding the American States settlement, as of June 24, 1996. As previously discussed, Freise's advice to defer consummating the settlement pending resolution of the dram shop claim was legally sound. Freise advised the deferral in the best interests of Jeff, JoLynn, and their children—notwithstanding that his own best interests would have been served by consummating the settlement immediately and taking his contingency

fee and recovering his costs advanced then and there. The trial court did not err in concluding as a matter of law at the time of summary judgment that Freise had substantially performed his obligations under the contingency fee contract with respect to the American States policy limits, before he was discharged by John and Jeff.

RCW 4.24.005

The purpose of the trial was to determine the reasonable amount of attorney fees owed to Freise and his law firm for legal services to Jeff Barrett prior to Freise's discharge. John and Jeff assign error to the following conclusion of law entered by the court following the trial:

> Plaintiffs' claims under RCW 4.24.005 as to the $100,000 UIM settlement with Pemco Insurance were not timely filed within 90 days of the final billing or accounting, but rather were filed nearly a year late. The Court has no jurisdiction to determine the reasonableness of those fees under this statute.

Clerk's Papers at 36.

RCW 4.24.005 provides:

> Any party charged with the payment of attorney's fees in any tort action may petition the court not later than forty-five days of receipt of a final billing or accounting for a determination of the reasonableness of that party's attorneys' fees. The court shall make such a determination and shall take into consideration the following:
>
> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) The fee customarily charged in the locality for similar legal services;
>
> (4) The amount involved and the results obtained;
>
> (5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) Whether the fee is fixed or contingent;

(9) Whether the fixed or contingent fee agreement was in writing and whether the client was aware of his or her right to petition the court under this section;

(10) The terms of the fee agreement.

John and Jeff Barrett contend that this conclusion is legally erroneous because: (1) the 45-day statute of limitations is tolled during the time a person is incompetent and (2) their claims under the statute were filed on May 9, 1997, which was within 45 days of the March 25, 1997 accounting sent by Freise to Tracy Waggoner, the guardian ad litem in the marital dissolution action.[2] The accounting contained a summary of Freise's time and costs through that date.

Addressing the second contention first, the trial court found that Freise submitted the accounting for the UIM settlement proceeds to JoLynn and Jeff on May 8, 1996, and that the 45-day limitation for contesting that accounting began to run on that date, rather than, as John and Jeff contend, on March 25, 1997, when Freise submitted his summary of time and costs to the guardian ad litem. The record fully supports the trial court's finding. The summary of time and costs submitted to the guardian ad litem in March 1997 is not a final billing or accounting for the proceeds of the UIM settlement. In fact, it contains no mention of the receipt and distribution of those proceeds. Rather, it is a summary of the time and services performed by Mr. Freise and other members of his law firm with respect to all of the claims that Freise had been pursuing for the Barrett family, and of the costs posted to the account with respect to all of the claims. It was provided to the guardian ad litem shortly after Freise received the letter

---

[2] We recognize that the trial court inadvertently stated in its finding here at issue that RCW 4.24.005 provides for a 90-day statute of limitations, rather than a 45-day limitation. The error is immaterial to the issues on appeal.

signed by John and Jeff telling him that he was fired, and was sent in contemplation that the guardian ad litem would be involved in the resolution of the brewing dispute between Freise and John Barrett regarding whether Jeff was bound to the contingency fee agreement or could elect an hourly fee arrangement, instead. Shortly after her appointment in December 1996 or early January of 1997, the guardian ad litem was apprised of all the aspects of the personal injury claims—including the receipt and disbursement of the UIM settlement funds which had taken place the previous May. The guardian ad litem did not indicate any objection to this; in fact, she expressly stated that she thought that Freise should continue to represent Jeffrey in the personal injury case.

■ The trial court rejected the contention that Freise should have arranged for the appointment of a guardian before consummating the UIM settlement and distributing the funds and also found that to the extent that Freise may have failed in any duty to Jeffrey in this respect, Jeffrey suffered no damages. The court expressly found that the funds paid over to JoLynn from the UIM settlement proceeds were used to provide necessary family and child support and medical treatment for Jeffrey—with the minor exception previously noted that was taken care of during the overall property distribution in the marital dissolution case. Moreover, the court expressly found that the contingency fee paid to Freise from the UIM settlement proceeds was reasonable in all the circumstances—a finding to which no error is assigned. *See* Finding of Fact 10, Clerk's Papers at 15. These findings are supported by substantial evidence in the record. Accordingly, they are verities for this appeal.

■ John and Jeff Barrett provide no authority for their contention that the 45-day statute of limitation was tolled, due to Jeff's mental disability, until 45 days after John Barrett, Jr., was appointed to serve as Jeff's limited guardian. Their reliance upon the general tolling statute, RCW 4.16.190, is misplaced. RCW 4.16.190 is limited by its own terms to the actions "mentioned" in chapter 4.16 RCW. The

statute here at issue has its own chapter, chapter 4.24 RCW. Accordingly, we affirm the trial court's ruling that the time period for contesting the contingency fee for the UIM settlement had elapsed nearly a year before the petition was filed. *Cf. Green v. Dunkin*, 67 Wn.2d 451, 453-54, 407 P.2d 985 (1965) (because chapter 4.16 RCW did not mention nor by inference refer to persons having a cause of action against a municipality or the sovereign state, RCW 4.16.190 was not applicable; actions against counties were governed by chapter 36.45 RCW and, notwithstanding disability of claimants due to their minority, their failure to commence suit within three months of county's rejection of their claim forever barred their lawsuit).

## The Trial Court's Order In Limine

On June 8, 1998, the trial court judge signed a pretrial order in limine that prohibited the parties from providing additional evidence and argument on issues that had been decided previously on summary judgment. The Barretts assign error to the trial court's order, contending that because the court's previous summary judgment rulings had decided that the fee contract was a valid contingent fee agreement and had decided that Freise had fully performed under the contract with regard to the UIM settlement, and that he had substantially performed under the contract with regard to the American States commitment to settle for policy limits, and because the trial court had dismissed all of the petitioners' damages claims, the order in limine essentially made the subsequent trial on the fee reasonableness petition pointless.

We see no abuse of discretion by the trial court here. As the trial court correctly noted, if the petitioners disagreed with the court's summary judgment decisions, they should have filed a motion asking the court to revisit its rulings or argued that there was newly discovered evidence that could not reasonably have been obtained at the time of summary judgment. *See* CR 59(a)(4) (reconsideration is warranted if there is new and material evidence that could

not have been discovered and produced at trial through reasonable diligence). Not having done so, the petitioners were not entitled to relitigate the facts and issues decided on summary judgment, and the trial court properly ruled as such in its in limine order.

Moreover, the trial was not "pointless." The court's task at the trial was to determine the *reasonableness* of the one-third contingency fee with respect to the American States policy proceeds, in light of the factors contained in RCW 4.24.005. After hearing five days of testimony, including the testimony of expert witnesses for each side, the trial court applied the statutory factors and determined that in all the circumstances a one-third contingency fee was reasonable with respect to the American States proceeds. Certainly one of the circumstances that the trial court considered was that, as previously concluded at the time of summary judgment, Freise had substantially performed his obligations under the contract with regard to those fees. But the court also considered the time and labor required, the novelty and difficulty of the questions involved, the skill requisite to perform the services properly, the fee customarily charged for such services, Mr. Freise's experience, reputation, and ability, and the fact that the fee contract was in writing. The court assessed the benefits that Freise was able to obtain for Jeffrey Barrett, including talking his health insurance carrier into both waiving its subrogation lien against any and all of Jeffrey's monetary recoveries and paying for his treatment at Mediplex for a substantial period of time. Although he charged no additional fee for these particular services, they substantially increased the value of Jeffrey's total recovery.

The court also considered the fact that, although Freise would recover no contingency fee against any potential recovery against the tavern—i.e., assuming a reversal by the Supreme Court of this court's affirmance of the judgment in favor of the defendant in that case, and also assuming a new trial and eventual plaintiffs' verdict or a favorable settlement—he had largely completed the discov-

ery necessary to either settle or litigate that claim before he was discharged. The court expressly took this into account in determining the reasonableness of the contingency fee with respect to the American States recovery.

The court also found that Freise had the experience and skill necessary to the representation, and that his performance was exemplary. And the court found the one-third contingency fee arrangement to be the same as that customarily charged in the locality for similar legal services.

The petitioners make no coherent argument challenging any of these findings, and they are fully supported by the record in any event. Their primary contention is that the trial court erred in relying upon *Taylor v. Shigaki*, 84 Wn. App. 723, for the proposition that Freise had earned his contingency fee with respect to American States before he was fired. They claim that *Taylor* is factually distinguishable because there the client fired his lawyer "on the courthouse steps" as it were and then settled with the insurance carrier on the same day—notwithstanding a clause in the fee contract that prohibited the client from settling in a manner that would "exclude the attorneys from their contingent fee." 84 Wn. App. at 730. As petitioners point out, Freise's fee contract does not forbid the client from settling in such a manner that would exclude the attorneys from their contingent fee. However, the contract does contain a clause granting the attorneys a lien against any proceeds of settlement, compromise, verdict or judgment in accord with the terms of the contract. This case is like *Taylor* in that here, the court found, based on substantial evidence, that John Barrett, Jr., terminated Freise's representation of Jeffrey "for the purpose of defeating the contingency fee and convert[ing] the fee entitlement to *quantum meruit*, which he understood was hourly." Finding of Fact 34, Clerk's Papers at 1531.

### Appeal of Various Factual Findings

Finally, John and Jeffrey Barrett contend: "The trial court, in its summary judgment, made numerous findings

of fact wholly unsupported, or actually contradicted, by the evidence. These errors are so numerous that they cannot possibly be itemized and argued within the page limitations of this brief." Appellants' Br. at 40. They conclude this section of their brief with these words: "Many of the findings of the trial court are contradictory, baseless and plainly in error. Some findings seem pulled out of thin air and reveal a most unjudicial lack of impartiality. Such findings should be afforded no weight." *Id.* at 46. Sandwiched between these two statements is a litany of contentions, most of which we have already addressed. As for those not already addressed:

Petitioners claim that, by approving the contingency fee arrangement, the trial court permitted Freise to recover the equivalent of an hourly fee of $620 per hour for his work on the UIM settlement and, by awarding him one-third of the American States recovery, the trial court permitted a total recovery that is the equivalent of an hourly fee of $2,174.26. They reach these erroneous conclusions by treating the recovery of all the hard costs advanced as fees and by going through the summary provided to the guardian ad litem and deducting a number of hours, after which they divided the total recovery by the remaining number of hours. But petitioners made a considerable fuss at trial regarding Freise's failure to keep time records for personal injury cases that are the subject of contingency fee contracts. Freise prepared the summary for the guardian ad litem by going back through his records and estimating time spent. Petitioners' own expert testified that many capable plaintiffs' personal injury lawyers do not keep time records for their contingency fee cases. This being so, the trial court was more interested in the results Freise obtained for Jeffrey than in the amount of time he spent doing it. The court found that in terms of total value, including but not limited to the waiver of the medical carrier's subrogation claim and the payments obtained for Jeff's care at Mediplex, Freise's services resulted in overall benefits to Jeff worth some $175,000 more than the net proceeds of the UIM and American States recoveries.

Petitioners next contend that the trial court's summary judgment ruling and ruling at trial are inconsistent—because at summary judgment the court could not conclude as a matter of law that Freise's claim to be entitled to one-third of the American States recovery was reasonable and then, at trial, conclude that such fee was in fact reasonable. There is no inconsistency. There were genuine issues of material fact that needed to be tried before the court could rule on Freise's claim. The petitioners are grasping at straws here.

The petitioners argue that part of the trial court's finding number 52 stating that no one ever suggested to Freise that he ask the court to appoint a guardian for Jeffrey is not supported by the record, because he discussed that possibility with both JoLynn and his legal assistant. In context, the court's finding relates to Kahr, Love, and Waggoner—none of them suggested to Freise that he should request the court to appoint a guardian in addition to or in lieu of Waggoner's services as guardian ad litem in the dissolution action. These findings related to the petitioners' arguments at trial that Freise was remiss in his duty to Jeff by failing to ask the court to appoint a guardian, a proposition that the trial court rejected on several bases, including JoLynn's performance and that of Tracy Waggoner, as well as the fact that no damages were caused to Jeff by lack of a guardian during the time of Freise's representation.

The petitioners also complain that the trial court failed to find, based on the testimony of Robert Gould and William Rush, that the UIM settlement for policy limits and the commitment from American States to pay its policy limits essentially fell into Freise's lap with little to no effort on his part, due to the seriousness of Jeffrey's injuries. We deem this argument to be incredibly naïve and unworthy of serious discussion. The record fully supports the trial court's findings that Freise represented Jeffrey with skill

and that his performance was exemplary.

Affirmed.

COLEMAN and AGID, JJ., concur.